**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

COURTNEY D. W.,[1]

          Plaintiff,

v.                                    ACTION NO. 2:22cv431

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

          Defendant.

**UNITED STATES MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

Courtney W. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for benefits under Title II of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 8. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that the Commissioner's decision be **VACATED,** and the case be **REMANDED** to the Commissioner.

## I.   PROCEDURAL BACKGROUND

Plaintiff applied for disability insurance benefits on May 6, 2020, alleging disability beginning January 1, 2020, because of polyarthralgia, autoimmune disease, degenerative disc

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons.  Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

disease, breast cancer (stage 1), anxiety, and obsessive compulsive disorder.[2] R. 16, 204–10, 230. Plaintiff's date last insured for purposes of disability insurance benefits is December 31, 2025. R. 19, 219.

After denial of her benefits claim both initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 94–114, 132–33. Prior to the hearing, plaintiff amended her alleged onset date to May 1, 2020. R. 316. ALJ Michelle Wolfe heard the matter on January 20, 2022, and issued a decision denying benefits on February 25, 2022. R. 16–32, 38–80. On September 8, 2022, the Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 1–7. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed a complaint on October 17, 2022. ECF No. 1. The Commissioner answered on January 25, 2023. ECF No. 6. Plaintiff filed a brief in support of the appeal on February 20, 2023, respondent filed a brief in support of the decision denying benefits on March 22, 2023, and plaintiff replied on April 4, 2023. ECF Nos. 10–12. Absent special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II.    RELEVANT FACTUAL BACKGROUND

Plaintiff argues that the ALJ failed to adequately evaluate and explain the analysis of the opinions of plaintiff's pain management specialist, Dr. Brian Weaver, and failed to properly address plaintiff's undifferentiated connective tissue disease when determining she did not meet

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

listing 14.06 at step three.[3]  Pl.'s Br., ECF No. 10, at 1.  The Court's review of the facts below is tailored to such arguments.

### A.    *Background Information and Hearing Testimony by Plaintiff*

Plaintiff, represented by counsel, testified by telephone before ALJ Wolfe on January 20, 2022.  R. 38–80.  Plaintiff is a high school graduate, and attended college.  R. 46.

Before stopping work in 2020 due to fatigue, achiness, and joint pain, plaintiff worked as a weight loss consultant for approximately 23 years.  R. 45–47, 51.  She described this work as meeting with clients in 20-minute increments, typing information into a computer, and providing food to the clients for the week.  R. 47–48.  She received shipments of food, including frozen food, twice a week.  R. 48.  She stocked an industrial freezer and lifted boxes over 25 pounds.  *Id.*  She explained that, after the pandemic, she would talk with clients by phone and then carry bags of food outside to the clients' cars.  R. 49–50.

Plaintiff testified that she struggled with widespread joint pain, achiness, and severe fatigue, and she received treatment for these symptoms from a pain management specialist starting in 2015 or 2016.  R. 46, 51–52.  The pain was primarily in her neck, back, hands, and wrists.  R. 52.  This was initially treated with physical therapy and injections.  *Id.*  She tried different anti-inflammatory medications, but stopped taking them after a few years because they caused stomach issues.  R. 53–54.  At the time of the hearing, she was taking Tylenol-3 and over-the-counter Tylenol.  R. 54.  Plaintiff was diagnosed with connective tissue disease in March 2020 by a rheumatologist, which was also treated with medication.  R. 53.

---

[3] Because the Court is recommending remand based on the ALJ's failure to adequately evaluate and explain whether Dr. Weaver's opinions are supported by and consistent with the evidence of record, the Court does not address plaintiff's argument regarding an insufficient explanation at step three.

Plaintiff explained that her hands and wrists were stiff, painful, and would swell.  R. 56. Plaintiff needed to use both hands to lift a ½ gallon of milk due to weakness, and could only write for a short period of time before pain in her hands caused her to stop.  *Id.*  Plaintiff had constant aching pain in her neck and mid-back, and intermittent pain in her hands, shoulders, and hips.  R. 57–58.

Plaintiff took naps in the morning and afternoon for one to two hours due to fatigue.  R. 58.  She rested intermittently throughout the day and planned only one activity each day due to fatigue.  R. 59.  She walked her dog for 10 to 15 minutes in the afternoon, did some shopping, and could do some housework, such as vacuuming or cleaning out the litter box, but she paced herself. R. 59–60, 62–63.  Her husband helped with grocery shopping and household tasks, especially those that required bending—cleaning the bathtub, taking out trash, and unloading the dishwasher.  R. 60, 62.  Plaintiff only prepared simple meals, such as those she could cook in the microwave.  R. 61.  She could not stand or sit for very long before needing to lie down due to stiffness in her back, and could only walk 10 to 15 minutes before pain required her to stop.  R. 61–62.

In a function report completed by plaintiff in May 2020, she provided similar information—using a heating pad daily for back and neck pain; needing a nap in the afternoon due to fatigue; feeding her animals twice a day, cleaning the litter box twice a day, walking her dog once a day; preparing simple meals daily for 15 to 20 minutes; needing to pace herself with laundry and household chores; driving alone and handling money; and occasionally seeing friends, attending family events, and going to concerts.  R. 259–64.  Plaintiff reported having "a pretty good attention span," with no problems following written or spoken instructions, and getting along "fine" with authority figures.  R. 264–65.  She reported handling stress "ok," but indicated that changes to a routine gave her anxiety.  R. 265.

4

At the hearing, plaintiff testified that she received treatment from her primary care doctor for anxiety, and began seeing a therapist in July 2019 (twice a month) to treat her anxiety. R. 46–47, 54–55. Her anxiety sometimes gave her heart palpitations and made it difficult to breathe. R. 62–63.

Plaintiff's husband testified that they had been married for 18 years. R. 73. He testified that plaintiff slept "a lot," complained of pain in her neck and back, and is no longer able to do many things. R. 74. He testified that, due to her limitations, he does most of the household chores and shopping. R. 74–75, 77. He testified that plaintiff only gets halfway through cleaning up the apartment before she needs to take a nap, that she often uses a heating pad while laying down, and that she no longer is interested in socializing due to pain. R. 75–76.

## B.   *Hearing Testimony by Vocational Expert*

Josephine Doherty, a vocational expert ("VE"), also testified. R. 65–73. VE Doherty classified plaintiff's past employment as a weight loss consultant as light, semi-skilled work as generally performed, and medium as actually performed. R. 65–66. In response to the ALJ's hypothetical[4], VE Doherty testified that such a person could perform plaintiff's past relevant work as generally performed, but not as she had performed the job. R. 66. VE Doherty also testified that such a person could perform the past relevant work as it was generally performed even if limited to frequent pushing and pulling with the upper and lower extremities, but not if they also needed to transfer from sitting to standing throughout the workday every hour. *Id.* VE Doherty testified that additional jobs would be available to a person with all of the above limitations,

---

[4] The hypothetical prescribed no more than light work and was premised on a person of plaintiff's age, education, work history, and RFC who is limited to: (1) frequent balancing; (2) occasional stooping, crouching, crawling, kneeling, and climbing; (3) no climbing ladders, ropes, or scaffolds; and (4) frequent exposure to vibrations and hazards, including dangerous, moving machinery, and unprotected heights. R. 66.

including work as a routing clerk, information clerk, or mail sorter. R. 66–67. Further, VE Doherty testified that a person with the above limitations who was further limited to sedentary work could perform work as an order clerk, charge account clerk, and a ticket counter. R. 67–68.

If the hypothetical person could do simple, routine tasks along with occasional detailed tasks, but no complex tasks, VE Doherty testified that the past relevant work would be precluded but the other light and sedentary positions would still be available. R. 68. VE Doherty also testified that being off task 15% of the time would preclude 98% of the jobs and being off task 20% of the time would preclude all work. *Id.* VE Doherty clarified that all jobs discussed, including past relevant work, required frequent use of the upper extremity and the ticket counter position required constant reaching, grasping, and fine fingering. R. 72.

In response to questions from plaintiff's attorney, VE Doherty testified that all jobs discussed would be precluded if a hypothetical person was limited to occasional use of their hands, or would be absent two or more times per month. R. 69, 71.

### C. *Relevant Medical Record*

#### 1. *Treatment with Southeast Pain and Spine Care – Brian S. Weaver, M.D.*

Plaintiff began treating with Dr. Weaver with Southeast Pain and Spine Care in 2016 for progressively worsening and continuous cervical pain. R. 1006. Dr. Weaver assessed plaintiff with chronic cervical pain, facet arthropathy, spondylosis, and myofascial pain. R. 1008. He recommended cervical facet injections, anti-inflammatories, and physical therapy. *Id.*

Following her alleged onset date of May 1, 2020, plaintiff treated with Dr. Weaver on May 7, 2020, and she returned to Southeast Pain and Spine Care approximately every 2 months for treatment by Dr. Weaver or Ronald Nave, PA-C, under Dr. Weaver's direction. R. 965–1051; *see* R. 53–54 (plaintiff's testimony that she continued treatment with Dr. Weaver through the date of

6

her hearing in January 2022).   During this period, plaintiff was further assessed with mixed connective tissue disease, degenerative joint disease, and degenerative disc disease. R. 926, 965. Dr. Weaver or PA Nave consistently noted that plaintiff was in moderate discomfort and had "pain with cervical flexion, extension, lateral rotation, . . . lateral bend, . . . facet loading, . . . palpation over the myofascial components, palpation over the spinous process, and paravertebral muscles," with "significant myofascial tightness." R. 926, 934, 939–40, 942–43, 945, 947, 949, 951, 955, 957, 965. During these examinations, plaintiff was in no acute distress, had an appropriate affect, and her nerves were grossly intact. *Id.*

Dr. Weaver requested and reviewed the results of 3 MRIs:  an MRI of plaintiff's cervical spine in August 2020, her thoracic spine in November 2020, and her thoracic spine in November 2021.  R. 929, 959, 961, 963.  The MRIs revealed mild to moderate degenerative disc disease, facet hypertrophy and arthropathy, tiny disc protrusions, neural foraminal narrowing, scoliosis, normal spinal cord signal, and no significant interval change since previous MRIs dating back to 2016. *Id.*

In July 2020, Dr. Weaver noted that plaintiff's symptoms were progressively worse.  R. 957.  In December 2020, plaintiff was having more issues with her thoracic spine.  R. 949.  Dr. Weaver performed a cervical facet joint injection in October 2020 and bilateral thoracic facet injections in August and September 2021.  R. 932, 937, 953–54.  In August and September 2021, plaintiff had a limited range of motion due to pain, but normal strength, stability, coordination, and reflexes, and negative straight leg raising tests bilaterally.  R. 935, 939.  Dr. Weaver noted significant muscle spasm and myofascial trigger points, paraspinal spasm and tenderness, and vertebral spine tenderness.  *Id.*  Dr. Weaver also noted that plaintiff's "pain interferes with functional activities including activities of daily living, occupational demands and recreational

7

activities." R. 933, 938. Dr. Weaver discussed use of a TENS unit, topical medications, and multi-modal therapeutic options. R. 937. In November 2021, plaintiff continued to have normal strength, stability, coordination, and reflexes. R. 927–28. Her range of motion was limited due to pain, and she had a positive straight leg raising test, positive Patrick's test, and positive Gaenslen's test. *Id.*

### 2.   *Andrew Miller, D.O., Sentara Rheumatology*

In March 2020, plaintiff began treatment with Andrew Miller, D.O., with Sentara Rheumatology. R. 358. Plaintiff presented with an elevated ANA (antinuclear antibodies) test, polyarthralgia, unspecified fatigue, and unspecified chest pain. *Id.* She reported chronic joint and muscle aches in her neck, shoulders, back, hips, and wrists, with no "frank joint" swelling, radicular pain, focal weakness, or sensation loss. R. 358–59. On examination, plaintiff had no clear inflammation, normal strength and tone, and her Spurling's and straight leg raising tests were negative. R. 360. Plaintiff's markers for lupus, Sjogren's syndrome, mixed connective tissue disease, and rheumatoid arthritis were negative. R. 357. Her blood counts, liver, and kidney markers were normal. *Id.* Dr. Miller did not "see any clear evidence of an autoimmune disease," noting "sometimes autoimmune conditions can be hard to diagnose." *Id.* He prescribed diclofenac for joint aches. *Id.*

In April 2020, plaintiff reported that her symptoms worsened over the previous several months. R. 356. She did not try the diclofenac due to concerns about it aggravating her gastroesophageal reflux disease ("GERD"). *Id.* Dr. Miller noted plaintiff's high titer ANA with arthritis symptoms, fatigue, and family history of lupus, observed plaintiff's swollen thumb joints. R. 355–56. He assessed undifferentiated connective tissue disease without any evidence of organ involvement, and prescribed Plaquenil. *Id.*

8

In May 2020, Dr. Miller noted that plaintiff's connective tissue disease was stable with no evidence of organ involvement.  R. 438.  Plaintiff reported mid-back pain and stiffness.  *Id.*  Examination revealed plaintiff had mild scoliosis, normal reflexes, normal strength, and no inflammation.  *Id.*  Dr. Miller noted plaintiff was tolerating Plaquenil and he instructed her to try topical diclofenac as needed, to stay active with low impact exercise, and to stretch.  *Id.*

Plaintiff's examination in August 2020 remained the same.  R. 480–81.  Plaintiff reported "some minor generalized arthralgias," she was tolerating the Plaquenil, and she believed that it helped.  R. 480.  In February and August 2021, plaintiff's examination results remained the same as in May 2020.  R. 551–52, 621–22.  She reported ongoing joint and muscle aches, malaise, fatigue, and that her symptoms wax and wane.  R. 551, 621–22.  Her connective tissue disease remained stable with no organ involvement, and she was directed to continue her medication and follow up in six months.  R. 551, 621.

### 3.    *Brian Weaver, M.D., Medical Source Statement*

On December 22, 2021, Dr. Weaver completed a form that appears to have been prepared by plaintiff's attorney whereby Dr. Weaver indicated with check marks that certain medical diagnoses of plaintiff, made in his office notes as well as the office notes of other medical practitioners, were correct medical diagnoses.  R. 1054–55.  These diagnoses included:  chronic cervical pain, cervical facet arthropathy, cervical spondylosis, cervical myofascial pain, degenerative joint disease, degenerative disc disease, intractable cervical back pain, thoracic spondylosis, thoracic facet joint syndrome, connective tissue disease, and myofascial muscle pain. *Id.*  Dr. Weaver next indicated with check marks that the following symptoms experienced by plaintiff were consistent with her medical conditions:  daily pain in her mid-back, upper back, and neck; intermittent pain in her lower back and hips; widespread joint stiffness and muscle pain;

swelling and pain in her wrists and hands; fatigue; and malaise. R. 1056–57. Lastly, Dr. Weaver opined that, if plaintiff worked in a full-time competitive job: she would need to lie down or recline for 2 to 4 hours of the workday to manage her pain and fatigue; she would be off task 25% or more of a typical workday due to her symptoms; and she would be absent more than four days per month because of her impairments. R. 1057–58. Dr. Weaver indicated that, in his opinion, plaintiff experienced the limitations listed above "since at least the Spring of 2020" and plaintiff was unable to work full time in competitive employment. R. 1058.

Next, plaintiff provided a 19-page transcription signed by Dr. Weaver, documenting Dr. Weaver's answers to questions posed by plaintiff's counsel. R. 1061–80. Dr. Weaver described his treatment of plaintiff starting in 2016, including his diagnoses and the underlying causes of plaintiff's pain. R. 1063–65. Dr. Weaver described treating plaintiff with injections, anti-inflammatories, nerve medications, and finally, when conservative measures failed, opioids. R. 1066–69. Dr. Weaver described the symptoms of undifferentiated connective tissue disease that plaintiff experienced, including joint pain, arthritis, muscle weakness, fatigue, and malaise. R. 1069–70, 1074. Dr. Weaver explained that plaintiff was diagnosed by her rheumatologist, Dr. Miller, with connective tissue disease, which can lead to the arthropathy and spondylosis that Dr. Weaver previously diagnosed. R. 1064–65.

Dr. Weaver discussed his most recent examination of plaintiff in November 2021 that revealed "well defined myofascial trigger points," "spasms within the muscle" that were objectively observed, and "significant discomfort on normal movements including flexion on bending forward or extension." R. 1070–71. He described how he performs the Patrick's test, Gaenslen's test, and straight leg raise test, and that plaintiff tested positive for all of these. R. 1072–73. He stated that these tests reveal compression, irritation, and pressure on spinal nerves

10

and cannot be "faked." R. 1073. Lastly, Dr. Weaver confirmed that the symptoms plaintiff described, as well as the circumstances that aggravate and alleviate the pain she described, were "very characteristic" of her diagnosed conditions, including the inflammatory response that is a systemic problem affecting her entire body. R. 1075–78.

### 4.   *Consultative Examination by Keisha Perry, PA – June 28, 2020*

On June 28, 2020, plaintiff was examined by physician's assistant Keisha Perry at the request of the SSA. R. 447–52. Plaintiff reported fatigue, joint pain and stiffness, back pain, and anxiety. R. 448. Ms. Perry noted that plaintiff was able to sit comfortably during the exam, rise from the waiting room chair independently, and take off her shoes and socks without assistance. *Id.* Plaintiff was cooperative, with normal and fluent speech, appropriate mood, and linear and logical thought processes. *Id.* Ms. Perry noted no focal deficits upon neurologic examination. R. 449. Plaintiff had a non-antalgic gait, did not use an assistive device, and was able to walk on heels, on toes, and with a tandem gait. *Id.* Plaintiff had full strength in upper and lower extremities, full range of motion, and normal reflexes. R. 449–51. She had no tenderness, swelling, or deformity in her joints, with the exception of crepitus in her left wrist and left ankle, and a curvature of her spine. R. 451.

Ms. Perry noted a diagnosis of mixed connective tissue disease, and found "documentation to support [plaintiff's constant] joint pain and fatigue." *Id.* Ms. Perry found plaintiff could frequently lift up to 10 pounds and occasionally lift up to 100 pounds. *Id.* She found that, in an 8-hour day, plaintiff could sit for 8 hours, stand for 6 hours, or walk for 6 hours; could frequently reach, handle, feel, and grasp; and could occasionally bend, stoop, kneel, and squat. R. 451–52.

### 5.    *Consultative Examination by Karen Armstrong – October 9, 2020*

Karen M. Armstrong, Ph.D., a consultative examiner with Hampton Roads Behavioral Health, performed a psychological evaluation of plaintiff on October 9, 2020, at the request of the SSA.  R. 517–20.  During this evaluation, Dr. Armstrong diagnosed plaintiff with unspecified anxiety disorder and provisionally diagnosed plaintiff with obsessive compulsive disorder.  R. 519.

Dr. Armstrong noted that plaintiff came to the assessment alone, driving 20 to 25 minutes to get there.  R. 517.  Plaintiff reported anxiety, much of which was related to her health, with symptoms of excessive worry, "checking rituals," and occasional heart palpitations.  R. 518.  Her primary care physician prescribed Prozac for the previous 4–5 years to treat plaintiff's anxiety.  *Id.*  Plaintiff reported being more forgetful in her job for the previous year to two years, that her attention span was "slightly impaired," her energy level was "OK, not great," and that she was easily distracted.  *Id.*  Plaintiff denied problems with completing her daily living tasks or with managing her funds, and mood problems were not endorsed.  *Id.*  Dr. Armstrong determined plaintiff had a fair prognosis regarding anxiety and seemed to manage her symptoms reasonably well with her current treatment.  R. 520.

### 6.    *Opinions of State Agency Experts*

As to plaintiff's physical RFC, David Bristow, M.D., opined on initial review that she could: (1) occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; (2) stand and/or walk, as well as sit, roughly six hours in an eight-hour workday; (3) push and/or pull without limits, aside from those identified for lifting and carrying; (4) occasionally stoop, kneel, crouch, crawl, and climb stairs, ramps, ladders, ropes, and scaffolds; (5) balance without limits; and (6) work in various environments without manipulative, visual, communicative, or environmental limits.  R. 99–100.  Dr. Spetzler explained that plaintiff's exertional and postural

limitations were based on her joint pain and fatigue secondary to connective tissue disease. *Id.* On reconsideration, Richard Surrusco, M.D., affirmed Dr. Spetzler's opinions. R. 110–11.

As to plaintiff's mental RFC, Leslie Montgomery, Ph.D., opined on initial review that plaintiff's unspecified anxiety disorder "limits her to tasks that require little or no judgment" and "that involve simple duties in standardized situations with minimal variations." R. 100–01. She further opined that plaintiff's "mental limitations do restrict functional capabilities to some degree but she retains basic adaptive capacities." R. 101. Dr. Montgomery found plaintiff was moderately limited in her ability to: (1) understand and remember detailed instructions; (2) maintain attention and concentration for extended periods; and (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* On reconsideration, Howard S. Leizer, Ph.D., affirmed Dr. Montgomery's opinions. R. 111–12.

### III.    THE ALJ'S DECISION

To evaluate plaintiff's claim of disability,[5] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 404.1520(a). The ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work

---

[5] To qualify for disability insurance benefits, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *accord* 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

given her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 19–32.

First, the ALJ determined that plaintiff met the insured requirements[6] of the Social Security Act through December 31, 2025, and had not engaged in substantial gainful activity from May 1, 2020, the alleged onset date of disability, through February 25, 2022, the date of the decision. R. 19, 32.

At steps two and three, the ALJ found that plaintiff's degenerative disc disease of the cervical and thoracic spine, undifferentiated connective tissue disease, arthralgia, anxiety disorder, and obsessive compulsive disorder constituted severe impairments. R. 19. The ALJ classified plaintiff's other impairments as non-severe. *Id.* The ALJ further determined that plaintiff's severe impairments, either singly or in combination, failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 19–23.

The ALJ next found that plaintiff possessed the RFC to perform less than a full range of light work. R. 23–30. The ALJ also specified the following additional limitations:

> frequently balancing, and occasionally stooping, crouching, crawling, kneeling, and climbing, but never climbing on ladders, ropes, or scaffolds . . . frequent pushing and pulling with the upper and lower extremities; . . . frequent exposure to vibrations and hazards including dangerous moving machinery and unprotected heights. The claimant must be afforded a sit/stand option with each interval up to one hour each, but not causing her to be off task. She can do simple routine tasks, and occasionally perform detailed but no complex tasks.

R. 23.

---

[6] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

14

At step four, the ALJ decided, based upon the VE's testimony, that plaintiff could not return to her past relevant work as a weight loss consultant. R. 30. Having reviewed the DOT and the VE's testimony, at step five the ALJ concluded that plaintiff could perform existing jobs in the national economy, such as by working as a routing clerk, information clerk, and a mail sorter. R. 31. Accordingly, the ALJ concluded plaintiff was not under a disability from May 1, 2020, through February 25, 2022, and was ineligible for disability benefits. R. 31–32.

## IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Johnson*, 434 F.3d at 653. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was

reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Thus, reversing the denial of benefits is appropriate only if either (a) the record is devoid of substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *Id.*

## V.    ANALYSIS

### *The ALJ failed to provide sufficient explanation for finding that the opinions of plaintiff's pain management specialist, Dr. Weaver, were unpersuasive.*

Plaintiff seeks a remand arguing that the ALJ improperly evaluated the opinions in Dr. Weaver's medical source statement. Pl.'s Br. 13. Plaintiff argues that the ALJ's finding that Dr. Weaver's opinions were not persuasive was conclusory, contrary to regulation, and without sufficient explanation to permit judicial review. *Id.* at 13–16; *see* 20 C.F.R. § 404.1520c(b)(2). Plaintiff asserts the ALJ only "superficially" addressed the consistency factor and did not address the supportability factor "at all." Pl.'s Br. 15. Plaintiff argues that the ALJ's errors were not harmless because a proper analysis of Dr. Weaver's opinions that plaintiff would be off task 20% or more of the time, or be absent two or more times per month, would be work preclusive according to the VE's testimony. *Id.* at 16; R. 68–69, 71.

The Commissioner contends that substantial evidence supports, and that the ALJ correctly explained why Dr. Weaver's opinions were not persuasive. Def.'s Br. in Supp. of Decision Den. Disability Benefits, ECF No. 11, at 14–20. The Commissioner asserts that "[i]n reviewing the record, the ALJ considered both the supportability and consistency factors, as well as explained her reasoning for her conclusions." *Id.* at 18. The Commissioner then outlines the ALJ's discussion of the findings by the state agency physicians and the consultative examiners, as well as plaintiff's description of her daily activities. *Id.* at 18–19.

16

A.      *The applicable methodology for reviewing Dr. Weaver's opinions.*

The ALJ must consider and explain the persuasiveness of each medical opinion in the record.[7]  20 C.F.R. § 404.1520c(b); *see* 82 Fed. Reg. 5844, at 5854 (noting that the ALJ should "focus more on the content of medical opinions and less on weighing treating relationships against each other").  ALJ review of medical opinions and findings are based upon: (1) supportability, or the relevance and strength of explanations for the opinion; (2) consistency, or the similarity with other opinions; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the relationship, and extent of the relationship; (4) specialization, relating to the training of the source; and (5) other factors, including but not limited to the source's familiarity with other medical evidence and the SSA's policies and requirements. 20 C.F.R. § 404.1520c(a), (c).

In assessing persuasiveness, however, an ALJ's chief task is to decide and explain whether an opinion or finding is supported by and consistent with the record.[8]  *Id.* § 404.1520c(b)(2) ("Therefore, [ALJs] will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions"); *see* 82 Fed. Reg. 5844, at 5853 (describing these as the "two most important factors").  Explanation about the remaining factors is only required when an ALJ concludes that two or more medical opinions are equally supported by and consistent with the record.  20 C.F.R. § 404.1520c(b)(3).  Moreover, the rules dictate review of a provider's

---

[7] A "medical opinion" is a statement from a medical source about a claimant's limitations and ability to perform physical, mental, and other work demands, and to adapt to a workplace environment, in spite of her impairments.  20 C.F.R. § 404.1513(a)(2)(i)–(iv).

[8] Supportability is an internal review that requires an ALJ to consider how "objective medical evidence and supporting explanations presented by a medical source . . . support his or her medical opinions."  20 C.F.R. § 404.1520c(c)(1).  By comparison, consistency is an external review that requires an ALJ to determine how "consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources . . . ."  20 C.F.R. § 404.1520c(c)(2).

opinions on a collective basis, rather than opinion-by-opinion; negating the need for individual treatment of every medical opinion in the record. *Id.* § 404.1520c(b)(1). This framework guides the Court's review below.

**B.    *The ALJ did not adequately explain whether Dr. Weaver's opinion was supported by and consistent with the record.***

The ALJ does reference the correct regulatory provision, stating that she "considered the medical opinion[s] and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c." R. 23. The ALJ later explained the finding that Dr. Weaver's opinions were not persuasive as follows:

> The undersigned finds the opinion of Dr. Weaver that the claimant would be unable to work full time in competitive employment of no persuasive value, as it is a matter reserved to the Commissioner. *Regarding the balance of his opinion, the undersigned finds it not persuasive, as the evidence of record, including repeat physical examinations showing no deficits in motor strength, stability, and neurological findings (see, e.g. Exhibit 16F), does not support such severe limitations.*

R. 30 (emphasis added).

The ALJ correctly dismissed Dr. Weaver's conclusion that plaintiff could not perform full-time work. R. 1058. That determination is a matter reserved for the Commissioner, rather than a medical source. *See Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 356 (4th Cir. 2023) (citing 20 C.F.R. § 404.1527(d)). The ALJ's opinion does not, however, sufficiently address whether the remainder of Dr. Weaver's opinions are supported by and consistent with the record. Dr. Weaver provided the only medical source opinion from a treating provider in the record. In addition, he provided a thorough opinion spanning over 25 pages and addressing his treatment of plaintiff for over 5 years.

The supportability of Dr. Weaver's medical opinions turn, in significant part, upon their relationship with any supporting explanation he provided, as well as upon whether the opinions

18

align with and are derived from relevant objective medical evidence. *See* 20 C.F.R. § 404.1520c(c)(1). The ALJ references Exhibit 16F, Dr. Weaver's treatment notes that include findings from MRIs and other lab results, when making the finding that the "evidence of record, including repeat physical examinations showing no deficits in motor strength, stability, and neurological findings" do not support the severe limitations in Dr. Weaver's opinion. R. 30. In his lengthy medical source statement, Dr. Weaver explained that during an appointment in November 2021, he identified "well defined myofascial trigger points" on physical examination, and that by palpating the muscle, he observed muscle spasms within the muscle. R. 1071. Dr. Weaver also explained that plaintiff tested positive on the Patrick's and Gaenslen's tests that put pressure on a specific junction point in the lower part of the spine, and the straight leg raising test that puts pressure on the spinal nerves. R. 1073. Dr. Weaver linked plaintiff's symptoms to the conditions he diagnosed, and identified the limitations plaintiff would suffer during a work week due to those symptoms. R. 1054–80. The ALJ's one-sentence explanation for finding Dr. Weaver's opinions unsupported is not sufficient given his thorough opinion, including descriptions of the tests and examinations he performed to arrive at his conclusions with respect to plaintiff's limitations. *Id.*

Moreover, the ALJ failed to address the consistency factor with respect to Dr. Weaver's opinions. R. 30. The ALJ only cited Dr. Weaver's treatment notes in evaluating Dr. Weaver's opinions, without citation to the findings and opinions of other medical sources. *Id.* Although, the ALJ did consider the findings of the state agency physicians, the two consultative examiners, and plaintiff's description of her daily activities in determining the RFC, the Court cannot determine whether the ALJ considered the consistency of Dr. Weaver's opinions with this other evidence in evaluating the persuasiveness of Dr. Weaver's opinions.

The Court does not make a finding as to whether Dr. Weaver's opinions are supported by or consistent with the record. The Court does find, however, that the ALJ's single statement—that Dr. Weaver's opinions are not persuasive because "the evidence of record, including repeat physical examinations showing no deficits in motor strength, stability, and neurological findings . . . does not support such severe limitations"—considered in light of the remainder of those opinions, fails to sufficiently explain the ALJ's determination of persuasiveness in a way that allows the Court to conduct a meaningful review.

Based on the current record, including plaintiff's long work history, plaintiff's over five-year treatment history with Dr. Weaver, Dr. Weaver's lengthy and thorough medical source statement, and the fact that the record contains no other medical source statement from a treating medical provider, the ALJ's discussion of Dr. Weaver's opinions was insufficient. Accordingly, remand is warranted for the ALJ to consider and explain whether Dr. Weaver's opinions are supported by and consistent with the evidence of record.

## VI.    **RECOMMENDATION**

For these reasons, the Court recommends that the final decision of the Commissioner be **VACATED,** and the case **REMANDED** to the Commissioner for further proceedings. On remand, the ALJ should explain whether Dr. Weaver's opinions are supported by and consistent with the record in a way that is reviewable by the Court. On remand, the ALJ should also explain why plaintiff's impairments did not medically equal the severity of listing 14.06 for undifferentiated mixed connective tissue disease at step three.

## VII.   **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
October 26, 2023

21